## INSURANSHARES & GENERAL MANAGEMENT CO. v. UNITED STATES.
### No. 43543.

Court of Claims.
May 5, 1941.

840

William Flannery, of Elmira, N. Y. (Charles L. Brayton, of Elmira, N. Y., on the briefs; William H. Hayes and Roger S. Brassel, both of New York City, and William Flannery, of Elmira, N. Y., of counsel), for plaintiff.

Francis T. Donahoe and J. A. Rees, both of Washington, D. C., and Samuel O. Clark, Jr., Asst. Atty. Gen. (Robert N. Anderson and Fred K. Dyar, both of Washington, D. C., on the brief), for defendant.

Before WHALEY, Chief Justice, and LITTLETON, WHITAKER, JONES, and MADDEN, Judges.

MADDEN, Judge.

Plaintiff in 1927 and 1928, then known as the Insuranshares Management Company, entered into agreements with Insuranshares Corporation, herein called the distributor, and Farmers Loan and Trust Company, herein called the trustee. By these agreements five investment funds were set up in the hands of the trustee. The funds consisted of stocks of banks, trust companies and insurance companies designated by plaintiff, acquired by the distributor and deposited with the trustee. The two funds involved here were H–27, set up in 1927, and B–28, set up in 1928. Under the agreements, plaintiff's function was to act as manager, selecting the securities to be acquired and placed in the fund, and directing their subsequent disposition and performing numerous other functions as manager of such a trust, as set out in finding 4. The distributor's function was to acquire the securities designated by plaintiff, deposit them with the trustee, and receive in return certain shares in the fund, which shares it might retain or market. The trustee's function was to hold, as trustee, the securities deposited with it by the distributor and to issue the shares hereinafter described.

Under each agreement, the trustee was to issue two different kinds of participating shares. One kind, to be issued to the distributor, for sale to the public, if it so desired, was an inseparable combination of so-called A and B shares. Each A share had a par value of $20. B shares had no par value. Each A share was entitled to a noncumulative semiannual distribution out of the net income of the fund, at the rate of 3% per annum. Each B share was entitled, after the rights of the A shares had been satisfied, to a pro rata distribution of at least 20% of the remaining net income, and of so much more of it as should be determined by plaintiff and approved by the distributor. Each A share was entitled, in liquidation, to a distribution of $20, its par value, and the holder of a combination A share and B share was entitled on two specified dates per year, on seventy days' notice, to turn in his share certificate and receive, either in cash or securities, whichever should be elected by plaintiff, the value of his shares, less a charge of two dollars for each A share, and less a further charge for redemption of one-third on one percent. In short, the A share part of the in-

separable combination had the qualities of a preferred stock, and the B share part of it had the qualities of a common stock, comprising all rights to income above the noncumulative 3% per annum, and all rights to increases in the capital of the fund.

The other kind of share which each agreement called for was a separate B share, which had the same rights as the B share in the combination just described. These shares were to be issued only to plaintiff, and were to be its sole compensation for the management of the trust. It was to receive 18 B shares for every one hundred B shares issued to the distributor in the combination shares.

At the time each fund was set up, the then market value of the securities deposited with the trustee was divided by twenty, the dollar par value of the A shares, and a number of combined shares equal to the quotient was issued. An immediate liquidation would, then, have permitted no distribution on the B shares either to plaintiff, or to the holder of the combined share. When additional securities were placed in the funds, and additional certificates were issued, the price of the shares sold was adjusted to prevent dilution of the investments of earlier investors and to avoid giving later investors a share in any increment already accrued to the fund.

Plaintiff became entitled in 1927 under the H–27 agreement to 36,000 B shares. The shares were not actually issued to it until 1928. In its corporation income tax return for 1927, filed March 15, 1928, on the accrual basis, it returned as income on account of these B shares one dollar, having valued them at one cent each and having set up a reserve against even that valuation of all of it except one dollar.

In 1928, plaintiff became entitled to 10,800 B shares under the H–27 agreement and 37,800 shares under the B–28 agreement. In its return for that year it stated a value of $41,688 for the former shares, $3.85 per share, and a value of $15,200.73 for the latter shares, 40.2 cents per share. It also included, in its 1928 return, B shares to which it had become entitled in 1927, viz, 63,450 B shares in H–27 and three other funds, of a total value of $86,395.50, deducting one dollar from that sum because of the return of one dollar made in 1927.

The total of $143,283.23, then represented plaintiff's valuation of the B shares to which it became entitled during the two years 1927 and 1928, and $86,394.50 of that income, accounting for $10,361.91 of its tax, was attributable to 1927. It claims therefore that that part of its tax should be refunded, since it was not obliged to pay it as a 1928 tax, and the defendant's right to collect it as 1927 tax is barred by the statute of limitations.

Plaintiff also claims that a sum of $82,038.75 which it included in its 1928 return as "undistributed income of Insuranshares Funds-B shares" which was plaintiff's pro rata interest, by reason of its ownership of separate B shares, in the income earned by the five trust funds during 1928, as distinguished from the B shares themselves which it received as compensation during 1928, was improperly included, or should have been deducted, as corporate dividends, since the funds themselves were taxed as corporations upon their income. Since this sum of $82,038.75 accounted for $9,844.65 of the tax plaintiff paid in 1928, it asks also for a return of that amount, making a total amount of $20,206.56 claimed for return.

The defendant's contentions are:

1. There was no sufficient claim for refund as to the asserted overassessment of $82,038.75 and overpayment of $9,844.65.

2. There was no timely claim for refund as to the asserted overassessment of $86,394.50 and overpayment of $10,361.91.

3. If either or both of the foregoing contentions are found to be without merit, still plaintiff is not entitled to recover, because the B shares to which it became entitled in 1928 had a fair market value of more than the total income returned by plaintiff for 1928, and therefore plaintiff underpaid, rather than overpaid, its 1928 tax.

The defendant does not seriously contest plaintiff's contention that the $82,038.75 item in the 1928 return was deductible as a dividend of a domestic corporation. Revenue Act of 1928, § 23, page 356. The funds were taxed on their incomes as domestic corporations within the meaning of the statute, and it follows that their distributions should be treated as those of domestic corporations, not taxable to the shareholders receiving such distributions.

■ As to the defendant's first contention that the refund claim timely filed, and quoted in finding 10, was insufficient, we think that the claim was sufficient. The claim was conditional, but the contemplated condition was that the funds should be taxed as domestic corporations, and that happened. That such taxation should be, strictly, double taxation of plaintiff was not really a part of the condition. It follows that unless plaintiff underpaid its taxes for 1928 in some other respect, it would be entitled to a refund of the $9,844.65 tax paid on the $82,038.75 item of income.

■ The defendant's second contention, relating to the timeliness and sufficiency of plaintiff's claim for refund of taxes paid in 1928 on 1927 income, presents a more serious question. It will be remembered that plaintiff filed its first claim for refund of 1928 taxes on March 12, 1931, which was within the permissible two-year period after payment of the tax. Revenue Act of 1928, § 322(b) (1), 26 U.S.C.A. Int.Rev.Acts, page 436. Its claim relating to its return of 1927 income in 1928 was not filed until July 20, 1934, more than two years after the taxes had been paid. Plaintiff contends that this claim was a permissible amendment of its previous timely claim. We do not think so. The timely claim was specific, both as to the item of income to which it related and as to the asserted ground for refund. The 1934 claim related both to a different item of income and a different ground for refund. It was not an amendment, but a new claim, filed late. United States v. Andrews, 302 U.S. 517, 58 S.Ct. 315, 82 L.Ed. 398; Hanna Furnace Corp. v. United States, 31 F.Supp. 136, 90 Ct.Cl. 439; Guantanamo Sugar Co. v. United States, 38 F.Supp. 252, 93 Ct.Cl. ——.

■■ The fact that the previous timely claim had not yet been acted upon by the Commissioner of Internal Revenue at the time the later claim was filed is immaterial. The Commissioner has no power to waive the statute of limitations after it has run. United States v. Garbutt Oil Co., 302 U.S. 528, 58 S.Ct. 320, 82 L.Ed. 405.

■ The language of the court in Pink v. United States, 2 Cir., 105 F.2d 183, 187, relied upon by plaintiff, gives it no aid in this case. The court there said that where the orginal claim filed is such that the facts upon which the amendment is based would necessarily have been ascertained by the Commissioner in investigating the merits of the orginal claim, the amendment may be made after the statute has run. Here the investigation of the timely claim as to the nontaxability of dividends of domestic corporations would not lead the Commissioner to suspect that plaintiff had done the unusual thing of including 1927 income in its 1928 return. We conclude, therefore, that plaintiff's claim for refund of $10,361.91 taxes paid on its return of $86,394.50 of income in 1928, which was 1927 income, is barred because no timely claim for refund was made to the Commissioner of Internal Revenue. However, as we shall see hereinafter, even though plaintiff's claim for refund as to the 1927 income on which it paid 1928 taxes had been timely filed, the result would not be changed because even in that event plaintiff did not overpay its 1928 taxes.

The defendant's third contention is, as we have said, that regardless of the merits of either or both of plaintiff's asserted grounds for recovery, plaintiff underpaid rather than overpaid taxes on its 1928 income. It will be remembered that plaintiff in 1928 became entitled to 10,800 B shares in Fund H–27 and 37,800 B shares in Fund B–28. In the return it valued the former at $41,688 and the latter at $15,200.73, a total of $56,888.73. It arrived at these valuations by taking the market value of the underlying securities on the dates in question, subtracting from that sum the product of twenty times the number of A shares and dividing the remainder by the number of B shares. This, plaintiff claims, was its total taxable income in 1928, so far as relates to this controversy. We have held that as to $86,394.50 more of its return, which was 1927 income, plaintiff may not have a refund because it did not file a timely claim. It returned and paid taxes on $225,321.98. The defendant claims that the 48,600 shares had a fair market value, not of $56,888.73 as returned by plaintiff, but of at least $225,321.98, and that therefore plaintiff did not overpay its tax.

Our question then is whether these B shares had an average fair market value of at least $4.64 per share, which would justify all the income that plaintiff returned in 1928, or at least, $2.86, which

would absorb all the income as to which plaintiff is not barred by limitation from seeking a refund.

No one could get the separate B shares from the trustee except plaintiff, and it never sold them nor offered them for sale. No offer to plaintiff for them is shown. The B shares were bought and sold only in the inseparable combination with A shares.

Since the combined shares were not listed on any exchange, but were sold only "over the counter", no record is available of actual sale prices, but only of bid and asked quotations, as that is the practice of the financial journals which publish such reports. The following tabulation shows the number of B shares and the dates in 1928 on which plaintiff became entitled to them, the bid and asked quotations on the combined shares on those dates, as shown by the joint exhibit of the parties prepared from financial reports current in 1928, and the values of the B shares, assuming that the A shares accounted for $20 of the value of the combination, or in the alternative, of $18 of the combination.

888.73, at which plaintiff valued them in its return. But the market value of the A share portion of the combination was not $20. It could not have been more than $18, since the voluntary cashing in of a combination share by a shareholder was subject to a discount of $2 from the $20 par value. Counting the value of the A shares at $18, the tabulation shows that the B shares had a value of $238,500, which is more than the $225,321.98 which plaintiff returned and on which it paid taxes.

In fact the A shares in these funds had a market value of less than $18 per share. There would have been no reason why an investor would pay $18 for a preferred stock with a noncumulative return of 3% on a $20 par value, and a liquidating value of $18 if he desired to withdraw his cash from the enterprise. A better return could have been obtained on government bonds,[1] municipal bonds,[2] public utility bonds[3] or savings bank deposits,[4] forms of investment just as convenient. The investor in these combination shares was looking to the increment in value of the under-

| Date shares receivable | No. of shares receivable | Bid | Asked | Value of B shares | |
|---|---|---|---|---|---|
| | | | | A at $20 | A at $18 |
| *Fund B-28* | | | | | |
| February 1 | 9,000 | 21⅝ | 22½ | $14,625 | $32,625 |
| February 9 | 9,000 | 21⅝ | 22⅛ | 14,625 | 32,625 |
| March 9 | 9,000 | 21⅝ | 22½ | 14,625 | 32,625 |
| April 25 | 4,500 | 23 | 23½ | 13,500 | 22,500 |
| May 15 | 4,500 | 23 | 23½ | 13,500 | 22,500 |
| August 8 | 1,800 | 21⅜ | 22⅜ | 2,475 | 6,075 |
| | 37,800 | | | 73,350 | 148,950 |
| *Fund H-27* | | | | | |
| January 6 | 3,600 | 26⅛ | 26⅜ | 22,050 | 29,250 |
| January 10 | 3,600 | 26¼ | 26¾ | 22,500 | 29,700 |
| January 19 | 3,600 | 26½ | 27 | 23.400 | 30,600 |
| | 10,800 | | | 67,950 | 89,550 |

Assuming the A shares to have had a par value of $20, which plaintiff seriously urges that they had, the bid price for the B share portion of the combination at the time that plaintiff became entitled to its B shares was $141,300, as against the $56,- lying securities and to their dividends. The increases in value of the bank, trust company and insurance stocks comprised in these trusts, had, over the preceding years, been regular and substantial. Their cash and stock dividends had been large.

[1] The rate on long-term government bonds was 3.33%. Annual Report of the Secretary of the Treasury, June 30, 1939, p. 486.

[2] 4.02%, based on a selected list. United States Statistical Abstract, 1935, p. 284; The Bond Buyer.

[3] The figure given in the Standard Bond Investment Book (Standard Statistics Co.), based on 4,000 better grade issues, is 5.395%. The United States Statistical Abstract, 1935, p. 284, lists 4.68%, based on 15 better grade issues.

[4] In New York the average return was 4.39%. Savings Banks Association of New York, Annual Report, 1929.

The opportunity for the ordinary investor to obtain an interest in a selected list of such stocks, and to have the list managed by plaintiff must have been a principal attraction. The fact that the securities initially deposited in the H–27 trust on September 1, 1927, had cost the distributor an amount equal to $20 for each combined share, yet the shares had a bid and asked price of 23¼ and 23¾, respectively, on September 3, proves that the management trust set up by plaintiff added substantially in the mind of the investor to the bare value of the separate stocks in the trust fund. Plaintiff's method of valuation assumes that the investor's principal interest at the time of putting his money in is in what he would realize on it in a forced liquidation. If that had been first in the minds of the investors in the case of these shares, they would not have invested at all.

As to the earning power of the stocks in the trust, plaintiff's income of $82,038.75 from its class B shares for 1928 is significant. It had 48,600 such shares for the whole year, and 37,800 other such shares, most of them for the principal part of the year. Its average dividend from them was almost one dollar a share. The investor in the combined share was, similarly, receiving one dollar a share on the B part and 60 cents on the A part. It would have been difficult to convince him that, as plaintiff contends, the A part of the combined share was worth $20 and the B part $1.18, on the average, which was the value attributed to the B shares by plaintiff in its tax return.

An expert offered by the defendant placed the value of the A shares at $7.50 and attributed all the rest of the market price of the combinations to the B shares, thus giving them a·market value of from $13.50 to $21, at different relevant times. This expert was, at the time he testified, the manager of Insuranshares Certificates, Inc., the company formed when Insuranshares trust certificates were liquidated in the fall of 1929 for the purpose of forming a corporation whose stock would be listed on the New York Stock Exchange.

It is not necessary for us to determine the value so definitely. We are, as we have indicated, convinced that the aggregate value of the B shares in these two funds, received by plaintiff in 1928, was more than $225,321.98. Plaintiff having paid taxes on that sum, did not overpay its tax and is not entitled to recover. Its petition will, therefore, be dismissed. It is so ordered.