Per Curiam:
This case in which plaintiff seeks the recovery of an alleged overpayment of Federal estate taxes was referred pursuant to Buie 45(a) to Mastín G. White, a trial commissioner of this court, with directions to make findings of fact and to recommend conclusions of law which the commissioner has done in a report filed November 13, 1959.
The court, having considered the evidence, the briefs and argument of counsel and being in agreement with the con- *800 elusions reached by the commissioner, adopts his opinion and findings as hereinafter set forth as the basis for its judgment in this case. Plaintiff is therefore not entitled to recover and its petition will be dismissed.
It is so ordered.
OPINION OP THE COMMISSIONER
This case involves the application of Section 910 of the Internal Bevenue Code of 1939 (53 Stat. 138), providing as follows:
All claims for the refunding of the [estate] tax imposed by this subchapter alleged to have been erroneously or illegally assessed or collected must be presented to the Commissioner [of Internal Bevenue] within three years next after the payment of such tax. The amount of the refund shall not exceed the portion of the tax paid during the three years immediately preceding the filing of the claim, or if no claim was filed, then during the three years immediately preceding the allowance of the refund.[1]
The plaintiff bank, as executor of the estate of Algernon Blair, deceased, filed the estate tax return with the District Director of Internal Bevenue at Birmingham, Alabama, on June 15,1953. The return reported a net estate tax of $504,-313.79 payable to the United States, and this sum was paid with the return. However, the return contained errors prejudicial to the decedent’s estate; and, as a consequence, the proper amount of the estate tax was overpaid.
One of the errors related to the decedent’s Federal income tax liability for 1951. The estate tax return listed as an asset of the decedent’s estate an “Overpayment of 1951 Federal Income Tax on return of Algernon and Adele B. Blair [the decedent’s wife],” in the amount of $5,008.60. Actually, no overpayment of the decedent’s Federal income tax liability for 1951 had been made at the time of his death. On the contrary, there was a net Federal income tax liability for 1951 in the amount of $72,991.40 due and unpaid at the time of the decedent’s death.
*801 Another error related to the decedent’s income tax liability to the State of Alabama for 1951. The estate tax return included among the decedent’s debts one in the amount of $639.44 representing the “1951 Alabama Income Tax of Algernon Blair.” The actual amount of the 1951 income tax due the State of Alabama by the decedent at the time of his death was $2,139.44, rather than $639.44.
The true facts respecting the decedent’s Federal and Alabama income tax liabilities for 1951 at the time of his death were known to the plaintiff bank when the estate tax return was filed on June 15,1953, but such facts were overlooked in connection with the preparation and filing of the return.
An audit of the estate tax return was undertaken by an Internal Revenue Agent on March 10,1954. All the pertinent documents were furnished to the agent for examination by personnel representing the plaintiff bank. Among these documents was a balance sheet showing the condition of the decedent’s financial affairs as of the time of his death on March 14, 1952. This balance sheet showed (among other things) that, at the time of the decedent’s death, he owed $72,991.40 to the United States as Federal income tax for 1951 and $2,139.44 to Alabama as State income tax for 1951. However, no one representing the decedent’s estate specifically called these particular matters to the agent’s attention, and he did not notice them during the course of his investigation.
On June 5,1956, the plaintiff bank filed with the District Director of Internal Revenue at Birmingham a claim for an estate tax refund on behalf of the decedent’s estate. This claim set out the full amount of the estate tax previously paid as the “Amount to be refunded.” However, there was attached to the formal claim a supporting statement which indicated that the claim was actually based upon expenses, not yet definite as to amount, that would be payable in winding up certain business transactions in which the decedent had been engaged at the time of his death. The supporting statement identified the particular transactions that were involved in the claim, and explained them in some detail. The supporting statement went on to say that “This claim is, therefore, filed for the full amount of the entire estate tax *802 paid as a protective claim and when the correct amount of the foregoing items has been ascertained, claimant will notify the Commissioner that the claim may be reduced accordingly.” The decedent’s Federal and Alabama income tax liabilities for 1951 were not referred to in the supporting statement as providing any basis for the claim, although, as previously indicated, the true facts respecting these items were known to the plaintiff bank long before the claim for refund was filed.
Sometime between June 14 and July 9,1956, the plaintiff bank endeavored to reconcile its own accounts pertaining to the decedent’s estate with the estate tax return. During this process, the errors that had been made in the return relative to the decedent’s Federal and Alabama income tax liabilities for 1951 were noted. Within a few days, these errors were orally called to the attention of a local representative of the Internal Bevenue Service. However, this was more than 3 years after the filing of the estate tax return and the payment of the estate tax.
Subsequently, on October 19,1956, the plaintiff bank filed with the District Director of Internal Bevenue at Birmingham a further claim for an estate tax refund on behalf of the decedent’s estate. This claim again set out the full amount of the estate tax previously paid as the “Amount to be refunded.” However, the statement in support of the claim indicated that the claimant was actually seeking a refund of $38,737.52 based upon a number of “additional deductions” to which the claimant was allegedly entitled in connection with the estate tax return. The “additional deductions” covered matters that had been mentioned in the supporting statement attached to the original claim for refund, and also items relating to the decedent’s Federal and Alabama income tax liabilities for 1951 at the time of his death.
The plaintiff’s claim for refund was thereafter considered by the Commissioner of Internal Bevenue. On August 6, 1957, the Commissioner allowed the claim for refund in so far as it was based upon claimed additional deductions other than those relating to the decedent’s Federal and Alabama income tax liabilities for 1951. It was the opinion of the Commissioner that the portion of the claim based upon the *803 decedent’s Federal and Alabama income tax liabilities for 1951 was not allowable because these matters had not been asserted in the original claim for refund and because the second claim for refund had been filed too late to receive consideration.
The Supreme Court has held that where a claim for a tax refund has been filed with the Internal ^Revenue Service within the prescribed period of limitation but fails to state the grounds upon which the refund is demanded, it can subsequently be amended by specifying the grounds at any time before the claim in its original form has been finally rejected, even though the amendment is filed after the expiration of the period of limitation. United States v. Memphis Cotton Oil Co., 288 U.S. 62, 71 (1933). On the other hand, the decided cases make it plain that where a timely claim for a tax refund asks for the repayment of a definite sum upon a specific ground, the claim cannot be amended after the expiration of the period of limitation so as to ask for a refund on a ground different from that asserted in the original claim. United States v. Andrews, 302 U.S. 517, 524 (1938); Winchester Mfg. Co. v. United States, 88 Ct. Cl. 89, 104 (1939), cert. denied 308 U.S. 621.
The present case does not fall squarely under either of the two lines of authorities mentioned in the preceding paragraph. On the one hand, as previously indicated, the original claim for refund, which was filed within the 3-year period of limitation, set out the full amount of the tax theretofore paid as the “Amount to be refunded.” On the other hand, the supporting statement, which accompanied the claim and was a part of it, showed that the claim was actually based upon the deduction from the decedent’s gross estate of expenses, then indefinite as to amount, that would be payable in winding up certain specified business transactions. The supporting statement further declared that “when the correct amount of the foregoing items has been ascertained, claimant will notify the Commissioner that the claim may be reduced accordingly.” [Emphasis supplied.]
If the original claim as a whole is carefully considered, the conclusion seems inescapable that the plaintiff was asking for a refund only of the amount determined to be appro *804 priate upon the basis of the allowance of the items of expense mentioned in the supporting statement. That being so, it necessarily follows that when the plaintiff, after the expiration of the 3-year period of limitation, asked that additional deductions relating to the decedent’s Federal and Alabama income tax liabilities for 1951 be allowed in computing the amount of the refund, this was not an amendment clarifying the original claim, but a new and different claim filed too late because of the expiration of the 3-year period of limitation. United States v. Andrews, supra, at p. 520; United States v. Garbutt Oil Co., 302 U.S. 528, 535 (1938); Insuranshares and General Management Co. v. United States, 93 Ct. Cl. 643, 657 (1941); General Outdoor Advertising Co., Inc. v. United States, 137 Ct. Cl. 607, 612-613 (1957), cert. denied 355 U.S. 891.
The fact that the original claim was still pending before the Commissioner of Internal Revenue when the expanded claim was filed is immaterial. Seiberling et al. v. United States, 87 Ct. Cl. 611, 630 (1938), cert. denied 307 U.S. 634; Insuranshares and General Management Co. v. United States, supra, at pp. 657-658.
It is also immaterial that, prior to the expiration of the 3-year period of limitation, the files of the Internal Revenue Service contained data showing the actual amounts of the decedent’s Federal and Alabama income tax liabilities for 1951 at the time of his death. Angelus Milling Co. v. Commissioner, 325 U.S. 293, 299 (1945).
It is unfortunate that the errors in the estate tax return relative to the decedent’s Federal and Alabama income tax liabilities for 1951 were not noted and reported to the Internal Revenue Service in a proper claim for refund prior to the expiration of the 3-year period of limitation. However, the period of limitation for the filing of claims for tax refunds is prescribed 'by the Congress, and the requirement cannot be waived by the Commissioner of Internal Revenue or by this court. United States v. Garbutt Oil Co., supra, at p. 535; Insuranshares and General Management Co. v. United States, supra, atp. 658.
For the reasons set out above, it is my opinion that the petition in this case must be dismissed.
*805 FINDINGS OF FACT
1. The plaintiff is a national bank, and maintains its principal place of business at Montgomery, Alabama. It brings this action in its capacity as executor of the estate of Algernon Blair, deceased.
2. Algernon Blair was a building contractor and a resident of Montgomery, Alabama.
3. In March of 1952, as the deadline (March 15,1952) for the filing of Federal and Alabama income tax returns for 1951 approached, Algernon Blair was alive but very ill. He was a patient in a hospital located at Boston, Massachusetts, having been taken there from Montgomery because of the need for special surgery.
4. As it appeared that Algernon Blair would not be physically able to sign an income tax return on or before March 15, 1952, Douglas G. Jackson, of the accounting firm of Crane, J ackson & Wilson located at Montgomery, Alabama, telephoned to the Collector of Internal Eevenue at Birmingham, Alabama,[2] and orally requested an extension of 60 days for the filing of the 1951 Federal income tax return of Mr. Blair and his wife, Mrs. Adele B. Blair. (The firm of Crane, J ackson & Wilson had customarily prepared the Federal and State income tax returns for Mr. and Mrs. Blair over a period of years.) Mr. Jackson stated to the Collector that a tentative return, signed by the Blairs’ son-in-law, Charles Yoltz, who had a general power of attorney from Mr. Blair, would be transmitted to the Collector prior to March 15, 1952, accompanied by a check covering the estimated amount of income tax due the United States. This was confirmed by means of a letter written by Mr. Jackson to the Collector of Internal Eevenue on March 11,1952, and approved by Mr. Yoltz.
5. Accompanying the letter of March 11,1952, from Douglas G. Jackson to the Collector of Internal Eevenue at Birmingham (see finding 4) was a 1951 Federal income tax return, labeled a “tentative return,” which had been prepared *806 by Mr. Jackson on behalf of Algernon Blair and Mrs. Adele B. Blair. This “tentative return” showed an estimated income tax liability of $522,400, previous payments of $444,400, and an estimated balance due in the amount of $78,000. A check for $78,000, drawn on the account of Algernon Blair in The First National Bank of Birmingham and signed by Charles Voltz under his power of attorney from Mr. Blair, was transmitted with the “tentative return.”
6. On March 11, 1952, an Alabama income tax return for 1951, also labeled a “tentative return,” was prepared on behalf of Algernon Blair and Mrs. Adele B. Blair by Douglas G. Jackson and mailed to the State Department of Revenue at Montgomery, Alabama. This “tentative return” showed $1,500 as the estimated amount of the income tax due the State of Alabama for 1951. Accompanying the return was a check in the amount of $1,500 drawn on the account of Algernon Blair in The First National Bank of Birmingham and signed by Charles Voltz under his power of attorney from Mr. Blair.
7. Algernon Blair died in Boston, Massachusetts, on March 14.1952. At the time of his death, the checks in the respective amounts of $78,000 and $1,500 referred to in findings 5 and 6 had not been presented to The First National Bank of Birmingham for payment. (Mr. Blair will usually be referred to in subsequent findings as “the decedent.”)
8. Under the date of March 17, 1952, the Collector of Internal Revenue at Birmingham, Alabama, acting for the Commissioner of Internal Revenue, granted to the decedent’s estate and to Mrs. Adele B. Blair an extension of time to May 15.1952, for the filing of their 1951 Federal income tax return.
9. On March 18, 1952, the decedent’s last will and testament was admitted to probate. On the same date, the plaintiff bank was appointed executor under the will.
10. On April 2, 1952, a trust officer of the plaintiff bank transmitted to the Alabama State Department of Revenue at Montgomery, Alabama, the final Alabama income tax return for 1951 on behalf of the decedent’s estate and Mrs. Adele B. Blair. This return, which was prepared by Douglas G. Jackson, showed $2,139.44 as the amount of the income tax due the State of Alabama for 1951. Accompanying the *807 return were two checks drawn on the plaintiff bank and payable to the State Department of Revenue. One of these checks was in the amount of $1,500; and a covering letter stated that this check was “issued in lieu of a $1,500.00 check * * * on The First National Bank of Birmingham, which was not presented for payment prior to date of death.” The second check was in the amount of $639.44. The two checks covered in full the income tax shown by the return to be due the State of Alabama.
11. On April 3, 1952, a trust officer of the plaintiff bank transmitted to the Collector of Internal Revenue at Birmingham, Alabama, the final Federal income tax return for 1951 on behalf of the decedent’s estate and Mrs. Adele B. Blair. This return, which was prepared by Douglas Gr. Jackson, showed a Federal income tax liability of $517,491.40. for 1951, previous “payments on 1951 Declaration of Estimated Tax” in the amount of $522,400, and an “overpayment” in the amount of $4,908.60. In the return, a deduction in the amount of $2,139.44 was taken on account of the income tax due the State of Alabama for 1951. Accompanying the return was a check in the amount of $78,000 payable to the order of the Collector of Internal Revenue and drawn on the plaintiff bank. A covering letter stated that the check “is to be used in lieu of a check for that amount drawn on The First National Bank of Birmingham, * * * unpaid on account of the death of Algernon Blair.”
12. The checks in the amounts of $78,000 and $1,500 drawn on The First National Bank of Birmingham (see findings 5 and 6) were returned by the Collector of Internal Revenue at Birmingham and the Alabama State Department of Revenue, respectively, to the plaintiff bank for cancellation, promptly after the receipt by the Collector and the State agency of the substitute checks for the same amounts drawn on the plaintiff bank (see findings 11 and 10).
13. The substitute checks in the amounts of $78,000 and $1,500 drawn on the plaintiff bank (see findings 11 and 10) were presented to the plaintiff bank for payment, and were paid by the plaintiff bank, on the respective dates of April 5 and 8,1952.
*808 14. On June 9, 1952, the Internal Bevenue Service refunded to the decedent’s estate and Mrs. Adele B. Blair tlie “overpayment” of $4,908.60 shown on the final 1951 Federal income tax return for the decedent and Mrs. Blair (see finding 11), together with an additional amount of $100 determined by the Internal Bevenue Service to be due the decedent and Mrs. Blair as a refund on their 1951 income tax, plus interest in the amount of $38.22. The total payment referred to in this finding amounted to $5,046.82.
15. In December of 1952, the accounting firm of Crane, Jackson & Wilson prepared and submitted to the plaintiff bank a balance sheet showing the condition of the decedent’s financial affairs as of the time of his death on March 14, 1952. This balance sheet showed ('among other things) that as of March 14, 1952, the decedent owed $72,991.40 as Federal income tax for 1951 and $2,139.44 as Alabama income tax for 1951.
16. (a) On June 15,1953, the plaintiff bank; filed with the District Director of Internal Bevenue at Birmingham, Alabama,[3] an estate tax return on behalf of the decedent’s estate. This return, which was prepared by the accounting firm of Crane, Jackson & Wilson, with Douglas G. Jackson in charge, reported a net estate tax of $504,313.79 payable to the United States. This amount was paid to the District Director with the return.
(b) The estate tax return referred to in paragraph (a) of this finding showed as an asset of the decedent’s estate an “Overpayment of 1951 Federal Income Tax on return of Algernon and Adele B. Blair,” in the amount of $5,008.60. This was erroneous, as no overpayment of the decedent’s Federal income tax liability for 1951 had actually been made at the time of his death. On the contrary, there was a net Federal income tax liability for 1951 in the amount of $72,991.40 due and unpaid at the time of the decedent’s death.
(c) The estate tax return mentioned in paragraph (a) of this finding included among the decedent’s debts one in the amount of $639.44 representing the “1951 Alabama Income *809 Tax of Algernon Blair.” This was erroneous, as the actual amount of the 1951 income tax due the State of Alabama by the decedent at the time of his death was $2,139.44, rather than $639.44.
17. Under the date of June 17,1953, the plaintiff bank addressed to the Commissioner of Internal Revenue at Washington, D.C., a letter relative to the estate tax return mentioned in finding 16. The letter requested “a determination of the amount of estate tax and discharge from personal liability therefor * * This was acknowledged by means of a communication dated July 8,1953, from the Office of the Commissioner of Internal Revenue, stating that the plaintiff’s letter had been referred to the District Director of Internal Revenue at Birmingham, Alabama.
18. The estate tax return referred to in findings 16 and 17 was assigned to Internal Revenue Agent Ray W. Roark on December 14, 1953 for investigation. Agent Roark was a member of the estate tax group of the Field Audit Branch of the Audit Division of the Internal Revenue District covering the State of Alabama. He was stationed at Montgomery, Alabama. Agent Roark 'began an audit of the return on March 10, 1954. Shortly thereafter, he was informed by an officer of the plaintiff bank that a claim in the amount of $250,000 had been asserted against the decedent’s estate by Sigsbee Park, Inc., located in Florida, and that, in the informant’s opinion, the estate tax return could not be completely audited until after the settlement of such claim. Agent Roark thereupon set the estate tax return aside in order to await further developments with respect to the claim asserted by Sigsbee Park, Inc. This claim had not been settled as of the early part of 1956; but as the pertinent 3-year period of limitation was scheduled to run within a few months, Agent Roark resumed his audit of the estate tax return about the middle of January 1956. Mr. Roark called on Douglas G. Jackson for information, and Mr. Jackson gave him all the papers and documents that had been used in preparing the estate tax return. Among the papers furnished to Mr. Roark was the balance sheet mentioned in finding 15. This balance sheet showed (among other things) that at the time of the decedent’s death, he owed $72,991.40 *810 to the United States as Federal income tax for 1951 and $2,139.44 to Alabama as State income tax for 1951. However, no one representing the decedent’s estate specifically called these particular matters to Agent Boark’s attention, and he did not notice them up until the time of the completion of his audit of the estate tax return on March 24, 1956. As a result of such investigation, Agent Boark concluded that the decedent’s estate owed a deficiency of $3,744.96, plus interest, on the estate tax. This asserted deficiency, together with interest, was paid by the decedent’s estate on April 17,1956.
19. On June 5, 1956, the plaintiff bank filed with the District Director of Internal Bevenue at Birmingham, Alabama, a claim for an estate tax refund on behalf of the decedent’s estate. This claim showed $508,058.75 as the “Amount of assessment” and $508,058.75 as the “Amount to be refunded.” The following statement was submitted in support of the claim:
At the time claimant filed the estate tax return for federal estate tax and at the time claimant filed its waiver of restrictions on assessment and collection of deficiency and acceptance of overassessment on U.S. Treasury Department form Number 890, there were outstanding certain unliquidated administration expenses and claims against the estate which included claims of two creditors which were being contested by the executor and the claim by the executor against the surety of an electrical subcontractor on one of the projects in which expenses had been and will be incurred. One of the claims was by Eglin Village, Inc. of approximately $15,000.00 and said claim has now been liquidated by a favorable decision by the Supreme Court of Florida relieving the estate of the claim, but in defending against said claim the estate has incurred and paid $1,563.00 of attorney’s fees and expenses to Honorable Dixie Beggs, attorney of Pensacola, Florida, which said amount was not included in the deductions taken by petitioner in arriving at the net estate on which the tax was paid, and the payment of said amount will, when taken into effect in computing the estate tax, reduce the amount of the tax proportionately.
The other claim is with reference to Sigsbee Park, Inc. which involved two housing construction projects under contracts in excess of $5,000,000.00 in connection with which Sigsbee Park, Inc. first filed a claim against *811 claimant for $1.00 and other amounts and recently amended its claim to the amount of $250,000.00 and claimant does not know whether Sigsbee Park, Inc. will further amend its claim for a greatly larger amount. The claim is being contested by the executor both in the Circuit Court of Montgomery County, Alabama, and in the Florida court supervising the ancillary administration in that state. The contest of said claim will involve substantial litigation expense, the amount of which is not at this time known and cannot be accurately estimated. In addition to the claim filed by Sigsbee Park, Inc., claimant is prosecuting a claim against Seaboard Surety Company, the surety on the electrical subcontractors bond on the Sigsbee Park, Inc. projects, which, if unsuccessful will decrease the net value of the estate to the extent of litigation and other expenses, the amount of which cannot be at this time accurately estimated.
This claim is, therefore, filed for the full amount of the entire estate tax paid as a protective claim and when the correct amount of the foregoing items has been ascertained, claimant will notify the Commissioner that the claim may be reduced accordingly.
20. Sometime between June 14 and July 9,1956, the plaintiff bank endeavored to reconcile its own accounts pertaining to the decedent’s estate with the estate tax return mentioned in previous findings. During this process, the errors referred to in paragraphs (b) and (c) of finding 16 relative to the decedent’s Federal and Alabama income tax liabilities for 1951 were noted. These errors were orally called to the attention of Internal Revenue Agent Ray W. Roark by personnel of the plaintiff bank sometime during the period July 1-9,1956.
21. On August 28, 1956, a conference was held between officials of the plaintiff bank and Internal Revenue Agent Ray W. Roark.[4] After some discussion, and the presentation by bank personnel of evidence pertaining to several alleged errors in the estate tax return of the decedent’s estate, including the errors relative to the decedent’s Federal and Alabama income tax liabilities for 1951, Agent Roark indicated that he *812 would recommend approval of additional deductions totaling $102,146.93 from the decedent’s gross estate. These included deductions respecting the matters mentioned in the supporting statement attached to the claim dated June 5,1956, and, in addition, deductions that would reflect the true situation respecting the decedent’s Federal and Alabama income tax liabilities for 1951 at the time of his death. Agent Roark calculated the estate tax overpayment that would result from the allowance of the various additional deductions from the decedent’s gross estate, and such amount was $38,737.52.
22. The matter of the additional deductions referred to in finding 21 was reported favorably by Agent Roark to the Audit Division in the Office of the District Director of Internal Revenue at Birmingham, Alabama, and was thereafter considered by the Review Branch of that Division. The Review Branch took the position on or about September 11, 1956, that such deductions should be approved, except for the deductions relating to the decedent’s 1951 Federal and Alabama income tax liabilities. As for the latter items, the Review Branch took the position that they should be disapproved because these matters had not been included in the claim for refund that was filed by the plaintiff bank on June 5, 1956. Information regarding the views of the Review Branch was promptly reported to the plaintiff bank.
23. On October 19, 1956, the plaintiff bank filed with the District Director of Internal Revenue at Birmingham, Alabama, a further claim for an estate tax refund on behalf of the decedent’s estate. This claim again gave $508,058.75 as the “Amount of assessment” and $508,058.75 as the “Amount to be refunded.” However, the statement in support of the claim indicated that the claimant was actually seeking a refund of $38,737.52 based upon a number of “additional deductions” to which the claimant was allegedly entitled in connection with the estate tax return. The “additional deductions” covered matters that had been mentioned in the supporting statement attached to the claim dated June 5, 1956 (see finding 19), and also items relating to the decedent’s Federal and Alabama income tax liabilities for 1951 at the time of his death. With respect to the latter items, the supporting statement declared in part as follows:
*813 The claim for refund was filed on or about June 4, 1956, and shortly thereafter on or about July 9, 1956, claimant, in auditing the estate, discovered that there were two substantial errors in the estate tax return as follows:
1. There was erroneously included in Schedule F of “Other Miscellaneous Property” as Item 4, the following asset:
“Overpayment of 1951 Federal Income Tax in return of Algernon Blair and Adele B. Blair__$5008.60.”
2. There was erroneously included in Schedule K of “Debts of Decedent” as Item 3, the following debt:
“Alabama Department of Revenue — 1951 Alabama Income tax of Algernon Blair_ 639.44.”
Neither of these items should have been shown but there should have been included in Schedule K the following debts of the decedent:
1951 Federal income taxes due by decedent_$72,991.40
1951 Alabama income taxes due by decedent- 2,139.44
These errors came about as the result of the following very unusual circumstances: While the decedent was critically ill and at the point of death, tentative federal and Alabama 1951 income tax returns had been prepared for him and were filed a few days prior to his death. With the federal return was a check for $78,000.00 payable to the Collector of Internal Revenue. The Alabama return, with a check for $1500.00, was filed with the Alabama State Department of Revenue. The decedent died before either of the checks cleared the bank on which they were drawn. Shortly after the decedent’s death, the executor filed the final 1951 federal income tax return with the Collector of Internal Revenue at Birmingham with a check for $78,000.00 and filed the final 1951 Alabama income tax return with Alabama State Department of Revenue with checks for $1500.00 and $639.44. The fact that the checks sent just prior to the decedent’s death had not been paid was not noticed and the fact that both the federal and state income taxes for that year, 1951, were debts of the decedent and outstanding at the time of his death was overlooked in preparing tiie estate tax return.
24. On August 6,1957, the Commissioner of Internal Revenue allowed the plaintiff’s claim for refund in so far as it was based upon claimed additional deductions other than those relating to the decedent’s 1951 Federal and Alabama *814 income tax liabilities. With regard to the portion of the claim based upon the decedent’s Federal and Alabama income tax liabilities for 1951, the Commissioner allowed this portion of the claim only to the extent of an amount equivalent to the deficiency and interest that had been paid by the decedent’s estate on April 17, 1956 (see finding 18). The balance of this portion of the claim was disallowed on the grounds that it had not been asserted in the original claim for refund (see finding 19), and that the second claim for refund (see finding 23) had been filed too late to receive consideration.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is therefore dismissed.

 A similar 3-year period of limitation would be applicable to this case under Section 8511 (a) of the Internal Revenue Code of 19,54. as amended (26 U.S.C., 1958 ed., 6511(a)).

 The State of Alabama comprises one district in the Internal Revenue Service, and the district headquarters are maintained in Birmingham. At the time mentioned in finding 4, the head of the district had the title of CoUector of Internal Revenue.

 The title of the heads of the Internal Revenue Districts was changed from Collector of Internal Revenue to Director of Internal Revenue on May 13,1952, and to District Director of Internal Revenue on June 15, 1953.

 Agent Roark’s immediate superior in the Internal Revenue Service was also present at the conference. He acquiesced in Agent Roark’s actions that are mentioned in finding 21.